## HILDEBRAND *v.* GRAVES.

## Opinion delivered June 15, 1925.

1. HOMESTEAD—ORDER VESTING IN WIDOW—RIGHTS OF MINOR CHILDREN.—Since the adoption of the Constitution of 1874, art. 9, § 6, providing that the widow and minor children of a decedent shall share his homestead equally, the probate court has no power to make an order vesting the homestead in the widow, though it does not exceed in value the sum of three hundred dollars.

2. HOMESTEAD—ORDER VESTING IN WIDOW—VALIDITY.—An order of the probate court absolutely vesting the title to decedent's homestead in the widow during the minority of his children is void and incapable of confirmation or ratification by such children.

3. EVIDENCE—FORGERY OF DEED—BURDEN OF PROOF.—One who alleges that a deed was forged has the burden of proving it.

4. DEEDS—INVALIDITY—FORGERY.—Evidence *held* to sustain a finding that a deed was not a forgery.

5. FRAUD—NATURE OF FRAUDULENT REPRESENTATIONS.—To maintain an action for fraudulent representations as to land sold, the vendee must prove, first, that the fraud related to some matter of inducement to the making of the contract; second, that it wrought injury to him; third, that the relative positions of the parties were such that he must necessarily be presumed to have contracted upon the faith of the statements of the vendor; and, fourth, that he did rely upon them, and had a right to rely upon them, in full belief of their truth.

6. FRAUD—CIRCUMSTANTIAL EVIDENCE.—Fraud may be proved by circumstantial evidence, or by a combination of direct and circumstantial evidence.

7. FRAUD—PRESUMPTION.—Fraud is never presumed, but must be affirmatively proved by a preponderance of the evidence.

8. FRAUD—SUFFICIENCY OF EVIDENCE.—Fraud cannot be sustained by suspicious circumstances or conjecture; and where it is sought to prove it by circumstantial evidence the fraud must be such as to reasonably and naturally follow from the circumstances proved.

9. FRAUD—EVIDENCE.—In determining the question of fraud or undue influence, all the surrounding circumstances which might make the party claimed to have been defrauded susceptible and yielding, such as illiteracy, inexperience and yielding character, are to be considered; and, on the other hand, the life, character and antecedents of the party who is charged to have committed the fraud are to be considered.

10. FRAUD—SUFFICIENCY OF EVIDENCE.—Evidence *held* insufficient to sustain allegations of fraud in procuring a deed.

Appeal from Ouachita Chancery Court, First Division; *J. Y. Stevens,* Chancellor; reversed.

Luther Graves and others brought this suit in equity against P. T. Hildebrand and others to set aside certain deeds and oil and gas leases and quiet their title to 160 acres of land in Ouachita County, Arkansas.

The deeds and leases are sought to be set aside on the ground that the original deed whereby the plaintiffs conveyed the land to the defendant, Hildebrand, was a forgery, and also on the ground that it was procured by fraud and false representations.

The answer denied the allegations of the complaint. The 160 acres of land in controversy is situated in the Smackover oil fields and has become very valuable. The land was originally acquired as a homestead from the United States by Larkin Murphy in 1876. He died intestate in 1878, leaving his widow, Mary Murphy, and a minor son and daughter, named respectively Joe and Drucilla. Mary Murphy subsequently married a man named Graves, and had a son and two daughters by him, named respectively, Luther, Mary and Martha. Mary Graves continued to live on the land as her homestead after her second marriage. In 1884 the probate court made an order vesting the title to the land in Mary Graves. The order recites that there are no debts against the estate, and that the aggregate value of the real and personal property of the estate is less than $300. The order further recites that the value of the land is $160, and that the title to the same be vested in Mary Graves, the widow of Larkin Murphy, and the wife of Willie Graves at the time the order was made. Drucilla Murphy grew up and married Willie Newton. Joe Murphy died leaving a son, Ben Murphy, and there is some question as to whether he was a legitimate son. Mary Graves has continued to occupy the homestead, or a part of it, since the death of her husband. In the year 1905, Mary Graves conveyed to her son, Luther Graves, the west 40 acres of the land

in question. Luther Graves was at that time twenty-five years old. His mother intended to convey to him the west 53 1-3 acres of the homestead, and in 1911 executed to him a second deed conveying this tract to him. At this time Drucilla was married and lived on the middle 53 1-3 acre tract of the homestead. The mother still lived in the old home at the east end of the tract. Her two daughters, Mary and Martha, lived there with her. Martha married Henry Murphy in 1913, and her mother gave her the west half of the east 53 1-3 acres of the homestead. Martha and her husband built a house on the tract given them, and they have lived there ever since. Mary Graves made her a deed to said tract in May, 1922. In 1913, Mary married a man named Roper, and her mother gave her the east half of the east 53 1-3 acres of the homestead. A new house near the old homestead was built for Mary, and she and her husband moved into it and have lived there ever since. Afterwards, Mary Graves moved into the house with her daughter, Mary Roper, and lived with her. The husband of Mary Roper died, and she afterwards married a man named Dawn and is now Mary Roper Dawn. In 1897, Mary Graves conveyed the middle 53 1-3 acres of the homestead to Will Newton, the husband of Drucilla. Drucilla was at that time twenty-six years old. They continued to live on the middle 53 1-3 acres of the homestead until sometime in 1909, when they sold the land to Minerva Brister and moved away. Mary Graves divided the homestead between her children above-named and made no provision whatever for Ben Murphy and does not seem to have regarded him as a legitimate son of Joe Murphy. Ben Murphy was born after the probate court had made an order vesting the title to the homestead in fee in Mary Graves. The deeds from Mary Graves to her daughters, Mary Roper and Martha Murphy, were executed in May, 1922, and recited a consideration of $1. On June 1, 1922, Drucilla Newton and Ben Murphy made a contract with C. M. Martin, a lawyer of Camden, Arkansas, to recover their interest in the homestead upon a contingent fee of

one-half of the recovery, and as a part of the contract, they conveyed to Annie Martin, for C. M. Martin, an undivided one-half interest in that part of the homestead which they sought to recover. They also executed to Annie Martin an oil and gas lease on their entire interest in the homestead for a consideration of $100. Some time about the middle of June, 1922, P. T. Hildebrand and Guy Campbell of Camden, Arkansas, went to see an oil well which was being drilled in the same neighborhood, and found out about the land in controversy and the conflicting claims as to the title. Hildebrand was the cashier of a bank in Camden and employed Campbell to get the title for him. On June 19, 1922, P. T. Hildebrand received a quitclaim deed from Annie Martin. The consideration recited in the deed was $2,825 cash in hand. The deed was duly acknowledged on the same day before L. B. Smead, a notary public. On the 17th day of June, 1922, Minerva Brister and Isa Goodwin, her son, executed a deed to said land to P. T. Hildebrand and the consideration recited in the deed is $10. This deed was acknowledged on the same day before Guy L. Campbell, a notary public.

There is also in the record what purports to be a deed from Mary Murphy, Martha Murphy, Luther Graves, and Mary Roper to P. T. Hildebrand to said land. This deed is dated June 17, 1922, and purports to have been acknowledged on the same day before Guy L. Campbell, a notary public.

Evidence was introduced by the plaintiffs tending to show that this deed was a forgery, and also that it was procured by fraud and false representations. On the other hand, evidence was introduced by the defendants tending to show that the signatures to the deed was not a forgery, and that its execution was not a forgery, and that its execution was not procured by false representations. The evidence on this phase of the case will be stated or referred to more at length under appropriate headings in the opinion.

There also appears in the record a quitclaim deed from Ben Murphy to P. T. Hildebrand to said land. It recites a consideration of $10 cash in hand paid, and was executed and acknowledged on the 14th day of June, 1922, before L. B. Smead, a notary public.

There also appears in the record a quitclaim deed from Drucilla Newton and Victoria Wright to P. T. Hildebrand to said land. The consideration recited in this deed is the sum of $10, and it was executed on the 12th day of June, 1922. It was also acknowledged before L. B. Smead, a notary public.

Numerous deeds and oil and gas leases were executed by the grantees in the deed which is alleged to be a forgery, and to have been procured by false representations. All of these grantees have been made defendants to this action. Other evidence will be stated or referred to in the opinion.

The chancellor made a specific finding of fact to the effect that the deed from Luther Graves and other plaintiffs to P. T. Hildebrand to the 160 acres of land in question was not a forgery, but found that it had been procured by fraud and false representations. It was therefore decreed that the title to said lands should be divested out of the defendants, and that the deeds and leases under which the defendants claim title should all be canceled. The title to the 160 acres of land was decreed to be in the plaintiffs, and the decree provided that the title should be quieted in them.

*Gaughan & Sifford, Smead & Meek, Marsh & Marlin* and *Cockrill & Armistead,* for appellant.

*H. C. Compton, Henry Stevens, T. W. Hardy, Pace & Davis* and *R. E. Wiley,* for appellee.

HART, J., (after stating the facts). At the outset it may be stated that the order of the probate court by which an effort was made to vest the land absolutely in the widow, having been made during the minority of the children, is void. Larkin Murphy died in 1878 intestate, and at the time of his death the land was his homestead.

His widow continued to reside on the homestead with their minor children, and the order of the probate court was made in 1884, while the children were yet minors.

In *Sansom* v. *Harrell*, 51 Ark. 429, it was held that since the adoption of the Constitution of 1874, which provides that when the owner of a homestead dies his widow and minor children shall share the same equally, the power of the probate court to make an order under our statute vesting the estate of a deceased person in his widow, where it does not exceed in value the sum of $300, is confined to cases where the deceased leaves no minor children, or if he leaves such children, no part of his estate constitutes a homestead.

In the later case of *Smith* v. *Scott*, 92 Ark. 143, this court held that the probate court had no authority to make an order vesting the homestead of a decedent in his widow and minor children.

But it is insisted that this order became effective when the children arrived at the age of twenty-one years. There might be some plausibility in this contention if the probate order had been merely voidable. As we have already seen, the order was absolutely void, and was of no force and effect whatever. It was incapable of confirmation or ratification and could never acquire any vitality whatever.

On the question of the forgery of the deed from Luther Graves and the other plaintiffs to P. T. Hildebrand to the 160 acres of land in controversy, the court found in favor of the defendants. The burden of proof was upon the plaintiffs to establish the forgery of the deed. *Miles* v. *Jerry,* 158 Ark. 314, and cases cited.

A careful consideration of the evidence leads us to the conclusion that the finding of the chancellor in this respect was not against the weight of the evidence. According to the evidence for the plaintiffs, Hildebrand and Campbell came to them and persuaded them to allow them to represent them in straightening out the title to the land in question, and induced them to sign a blank piece of paper as a token that they were the accredited

representatives of the signers. One of the parties stated that the blank piece of paper had red lines on it.

In the first place, it would be very difficult to fill in the body of a deed on a blank piece of paper containing only the signatures of the grantors and attach a certificate of acknowledgment to the same without some indication tending to show that the body of the deed and the acknowledgment thereto had been filled in subsequently to the writings of the signatures, and this would be especially true where the blank paper had red lines on it and was folded up at the time it was signed, as the plaintiffs themselves testified was the case. Hildebrand and Campbell denied in positive terms that the deed was a forgery. In this respect they were corroborated by the testimony of Lamar B. Smead, who wrote the deed.

On the question of forgery, the witnesses were examined and cross-examined at length; but no useful purpose could be served by setting out their testimony in detail and reviewing it at length. We deem it sufficient to say that the chancellor properly held that the forgery of the deed was not established by a preponderance of the evidence.

The chancellor found for the plaintiffs on the ground that the deed to P. T. Hildebrand to the 160 acres of land in question had been procured by false representations.

To maintain an action for damages for false and fraudulent representations for land sold, the vendee must prove: First, that the fraud related to some matter of inducement to the making of the contract; second, that it wrought injury to him; third, that the relative positions of the parties were such that he must necessarily be presumed to have contracted upon the faith of the statements of the vendor; and, fourth, that he did rely upon them, and had a right to rely upon them, in full belief of their truth. *Matlock* v. *Reppy,* 47 Ark. 148.

This rule is so well settled in this State that a further citation of authority in support of it is not necessary.

It is also well settled that fraud may be proved by circumstantial evidence or by a combination of direct and circumstantial evidence. Because of the fact that men for the most part deal honestly with each other, fraud is never presumed, but must be affirmatively proved. Fraud cannot be sustained by suspicious circumstances or conjectures, but it must be established by a preponderance of the evidence; and where it is sought to prove fraud by circumstantial evidence, the fraud proved must be such as to reasonably and naturally follow from the circumstances so proved. *DuFresne* v. *Paul,* 144 Ark. 87.

In determining the question of fraud or undue influence, all the surrounding circumstances which might make the party claimed to have been defrauded susceptible and yielding are to be considered. *Caldcleugh* v. *Caldcleugh,* 158 Ark. 224.

Thus it will be proper to consider the illiteracy, inexperience, and yielding character of the party claimed to have been defrauded.

On the other hand, it would be equally pertinent to consider the life, character, and antecedents of the party who is charged to have committed the fraud. Many illustrative cases bearing on the subject have been cited and reviewed by counsel in their briefs. The testimony relating to this branch of the case has been discussed in great detail; but such a discussion in an opinion would make it too long to be of any practical value. No hard and fast rule can be laid down about weighing the evidence. As above stated, the rule of law to be followed is well settled, and the only difficulty is in applying it to the facts in each particular case.

When all the facts and circumstances adduced in evidence in this case are considered in the light of each other and with reference to the object sought to be accomplished by the transactions under investigation, we are of the opinion that the chancellor erred in finding that the deed whereby the title to the 160 acres of land in

question was placed to P. T. Hildebrand was procured by fraud.

It is true that the plaintiffs are all negroes, but they are not illiterate. Luther Graves is a farmer; but he has also been preaching for about eleven years. He thoroughly understood the increase in value of lands in his section of the country when oil was discovered on or near them. He knew the value and purpose of having a good abstract of title to land on which there was a chance to discover oil. He was having an abstract of title to his land prepared at the time the transactions in question were had. Prior to this time he had executed oil and gas leases on his land. He knew that such leases were of no value unless oil, was found on the land or on land near it. His sisters, Mary Roper and Martha Murphy, were educated. They commenced to go to school when they were small children and continued to go until they were grown. They too understood that the land was of but little value unless oil or gas was discovered upon it. They understood the nature and purpose of such leases. Minerva Brister, who had purchased the interest of Drucilla Newton, also knew the importance to be attached to the finding of oil and gas in that part of the country. They knew that the land was of but little value unless oil or gas was discovered in or near the land. They knew that there was some question about whether the probate order made in 1884 vested the title in fee to the land in Mary Graves, the widow of Larkin Murphy, the original owner of the land. They knew that, unless the title in fee had been vested in her by the probate order made in 1884, she only had a dower and homestead interest in the land.

It was claimed that Ben Murphy was the illegitimate son of Joe Murphy, who was one of the children and heirs at law of Larkin Murphy, the original owner of the land. All of these facts were known to all the plaintiffs at the time they first began to deal with P. T. Hildebrand and Guy L. Campbell about the land. Guy L. Campbell had been a resident of Camden for ten years

and P. T. Hildebrand for eleven years before the transactions in the present case occurred. Lamar B. Smead was a lawyer and resident of Camden. The above in brief is the situation and environment surrounding the parties to these transactions at the commencement thereof.

Hildebrand and Campbell approached the plaintiffs with a view of compromising the various claims of title to the land, and of settling the differences between the claimants. In order to do this, it was decided that all the conflicting claims and interests in the land should be conveyed by quitclaim deeds to P. T. Hildebrand, and that he would convey the land back to the respective claimants reserving a royalty interest in himself.

According to the testimony of Luther Graves and the other plaintiffs, they did not know that they were conveying their interests in the land to Hildebrand, and that they were receiving back only the title to the land and a fourth royalty interest out of whatever gas or oil might be discovered on the land. Lamar Smead denied that he had misrepresented the matter of the conveyances to them in any manner whatever. He testified that he simply wrote such deeds and leases as he was directed to write by the parties, and that the plaintiffs signed the same after consulting with each other. That they thoroughly understood what they were doing, and only signed the instruments after due consideration of their rights in the premises. He is corroborated by the testimony of Hildebrand and Campbell. At that time it was not known how valuable the land was, because the drilling of the oil wells on the adjacent land had not proceeded far enough to indicate any showing of oil or gas. Of course, the presumption is that Hildebrand and Campbell thought that the land would become valuable as oil or gas producing land or they would not have taken any interest in the matter.

On the other hand, the plaintiffs were equally interested, and had the same chance to know about the probabilities of discovering oil or gas. The fact that oil was

discovered on nearby land subsequent to the transaction in this case made the land in question very valuable; but its great increase in value might as well affect the credibility of the plaintiffs as that of Hildebrand and Campbell.

It is true that Smead subsequently acquired an interest in the land; but at the time of the transaction in question he had no interest whatever except that of an attorney to do what the parties directed him to do. At that time the land had not greatly increased in value, and there was no temptation to him to misrepresent the facts to the plaintiffs if he had had the mind and disposition to do so. All the parties seemed to have had the same end in view, and that was to settle the matter of title to the land, so that, in the event a well was brought in on the nearby land, they might have a clear title to the land in question and execute oil and gas leases with profit to those interested.

It is fairly inferable that all the interested parties knew that no profitable leases could be made unless the title to the land was settled, or unless all the parties claiming an interest in the land would sign the leases. To accomplish this end, the parties appear to have executed the instruments in question in this case for the purpose of settling the title and transferring to each other the part which each of the interested parties was to receive for his share.

It was not a question so much as to whether the claims of Drucilla Newton and Ben Murphy could be established by legal proceedings as it was to have the matter definitely settled, so that, if oil or gas was found in the neighborhood, the interested parties might be ready to execute leases. Some small sums of money in addition to the royalty interests were given to the plaintiffs.

Therefore we have reached the conclusion, after a careful review, that the allegations of fraud in the exe-

cution of the deeds and leases was not established by the plaintiffs within the rules of law above announced.

It follows that the decree must be reversed, and the cause will be remanded with directions to dismiss the complaint for want of equity, and for further proceedings in accordance with the principles of equity and not inconsistent with this opinion.