STATEMENT BY THE COURT.
This suit was brought by appellee, widow of deceased, Dick Hull, who died testate, seeking the cancellation of two deeds purporting to have been executed by her said husband prior to her marriage with him, alleging that they were forged, or, if genuine, they were executed for the purpose of defrauding her of her marital rights. The prayer was for the cancellation of the two deeds and the vesting in her of dower and homestead rights, and for a sale of the lands, if it could not be partitioned, and payment to her out of the proceeds of the widow's portion the value of the dower and homestead rights. Certified copies of the challenged deeds were exhibited with the complaint.
The defendants, appellants, the administrator of the estate, all of the devisees under the will of the deceased husband, one of whom, Arlis Hull, was the grantee in the *Page 632 
challenged deeds, were all properly served with summons, but only the administrator with the will annexed and the legatee, the grantee in the deeds, answered. The answer of the administrator was but a formal denial of the allegations of the complaint and an assertion of the want of interest in the controversy. The legatee, grantee, answered specifically denying the allegations of forgery and of fraud, and alleged that the deeds were genuine and executed in good faith and prayed for a dismissal of the complaint for want of equity.
It is undisputed that I. M. (Dick) Hull, the deceased husband, was childless; that by his first will, executed in 1919 during the lifetime of his first wife, all his property was given equally to his half sister and to four nephews and nieces, children of A. L. (Gully) Hull, a brother, and directly to them in the event the wife predeceased him. After the first wife died Dick Hull married appellee on November 16, 1929, and died or was killed on November 15, 1930.
The deeds questioned bear date of June 11, 1929, one conveying the "Clark Place" and the other the "Home Place" to Arlis Hull, nephew and one of the devisees in the will. They were recorded respectively November 21, 1931, and December 11, 1931.
Aside from the copies of the deeds, the will and the probate and chancery court proceedings in relation to the will, the testimony is by deposition, and it is voluminous. It tends to show that appellant is a son of A. L. (Gully) Hull and a nephew of Dick Hull, his uncle, a brother to appellant's father and to his other uncles, Andy, Abe and Marion and a half brother to Nettie Hiser, all of whom were living except his Uncle Dick, who was killed November 15, 1930, and one Johnson was convicted of the crime.
On February 25, 1932, appellant had notice served on Della Hull, appellee, widow of I. M. Hull, of his ownership of the Hull lands, and that he would expect the customary rent for the use of the lands, and a copy of this notice was exhibited. He also had notified her in *Page 633 
person in the month of January, 1932, in the presence of one Denny.
On June 11, 1929, his Uncle Dick gave him the two deeds in question, which he had recorded. The one to the "Home Place," where his uncle lived at the time of his death and the widow still lives, conveyed 80 acres and was recorded about December 11, 1931; the other deed was to the "Clark Place" and this was also recorded, although they were not recorded at the same time, the deed to the "Clark Place" being recorded about 20 days before the other one. Witness said he took both deeds at the same time for record to John Pulliam, the circuit clerk at Berryville, who told him that they would have to be recorded at Eureka Springs in the other district, and that he would take them over there and have them recorded. Appellant paid the clerk $3 fees for the recording. Explained the reason for the deeds being recorded on different dates, saying that when he called at the office for them Mr. Pulliam, the clerk, said in his hurry he had forgotten them and recorded only one which he found, but would find the other and have it recorded in a few days, and he could call for it then. Said Pulliam was dead, as was also the justice of the peace, J. H. Holman, who wrote them, and I. M. Hull who executed the deeds. Said he had given the deeds to his father to deliver to attorney Leathers to file with the suit. Said no subpoena had been served on him to bring the deeds or testify; understood that a subpoena had been left at his father's house, but had never seen it; said the deeds were sent to attorney Leathers just before the answer was filed in this case, and he supposed they were withdrawn by Mr. Holman, who made the deeds. When the deeds were executed, the first he knew of them was when his Uncle Dick gave them to him and said he owed him $2 for them which witness gave him. But that was not all that was said at the time.
He did not know than appellee was going with his uncle, who had never said anything about getting married to him. He was in poor health and said, "Here are the deeds for this." Said he didn't want some of the kin *Page 634 
to have it. His uncle did not have possession of the lands or control of them, but lived on one of the places, the "Home Place" of which he had control. They had a verbal contract about how long he was to live there, and witness had control of the "Clark Place" and did not have to pay rent.
He could not find the original deeds to produce at the trial. He went to the clerk's office in the same building where attorney Leathers had his office with the circuit clerk, C. D. Walls, where Leathers had left the deeds with the clerk Walls to be delivered to him because he was going to be out of town. Was not present when Leathers delivered the deeds to Walls, and could not find Walls at his office when he tried to see him and get the deeds.
There was much testimony by the other members of the family tending to show that it was not understood in the community that appellee and the deceased were going together or that anybody knew of the contemplated marriage before it occurred, or that such marriage was contemplated before the execution of the deeds.
There was much testimony also about the feeling existing among the relatives and of the deceased toward his brothers and sisters; that he had frequently said what he was going to do with his property in order that they should not be in a position to quarrel over a division of it. One witness stated that deceased asked his help at one time, saying he didn't want to ask his folks to do anything, that they had never done anything for him, and that was why he had married so his kinfolks could not fight over his property.
The testimony also showed deceased's attitude about this, and his various statements, made long after it was claimed the land had been deeded away, disclosed that he still claimed ownership thereof. One witness testified that he had made some remarks about conveying the places, thinking it might prevent one of his enemies in the community from killing him, which he had threatened to do; such testimony indicating that he had not disposed *Page 635 
of these places, but still owned them long after the date of the purported conveyance by the deeds.
One witness corroborated the statement of appellant about the deeds having been delivered to him by the grantor, saying he had seen the deeds delivered to him along with the statement that they were the deeds.
The testimony, however, showed that the grantor in the deeds was dead; that the official who wrote them and took the acknowledgments to them was also dead; and that the clerk, Mr. Pulliam, to whom they were delivered for record at Berryville and who said he would take them to Eureka Springs for proper record, was also dead. That the original deeds were not produced in evidence, notwithstanding they had been demanded, although an explanation was made by appellant attempting to show why the demand had not been complied with.
The chancellor found that certain deeds conveying the lands to Arlis Hull were recorded on certain dates, and that "Arlis Hull failed to produce said original deeds in testimony, although the burden of proof was upon him to show that said deeds were genuine"; and also that said deeds were not executed by I. M. Hull and were not genuine, but that both were forgeries and should be canceled, and decreed accordingly, holding the widow entitled to dower and homestead in the lands, and from this decree this appeal comes.
(after stating the facts). It is insisted that the chancellor's findings and decree are contrary to the preponderance of the testimony. Although the court incorrectly announced in its findings that the burden of proof was upon appellant, he having failed to produce the original deeds in evidence when demanded, to show the alleged forged deeds were genuine (Hildebrand v. Graves, 169 Ark. 210, 275 S.W. 524; Miles v. Jerry,158 Ark. 314, 250 S.W. 34), it is also true that such failure to produce the original deeds created a presumption that such deeds, if produced, would favor the claim of *Page 636 
plaintiff. Ramey v. Fletcher, 176 Ark. 196, 2 S.W.2d 84; Lynch v. Stephens, 179 Ark. 118, 14 S.W.2d 257.
Appellant'S explanation of his failure to produce the deeds when demanded was evidently not satisfactory to the court, nor sufficient to overcome the presumption.
The majority is of opinion, after a careful examination and analysis of the testimony, in which the writer does not concur, that the chancellor's findings and decree are supported by the preponderance of the testimony; and no useful purpose would be served by setting out the testimony more fully as the matter is largely a question of fact, which has been found in the appellee's favor upon testimony sufficient to support the decree.
We find no prejudicial error in the record, and the decree is affirmed.