JAMES *v.* UNITED FARM AGENCY.

4-5480 128 S. W. 2d 365

Opinion delivered May 15, 1939.

*C. C. Wait*, for appellant.

*Jesse Reynolds* and *Chas. Maze*, for appellees.

BAKER, J. Harve Taylor was part owner of a forty-acre tract of land. He had inherited an interest from his father and acquired some other interests therein. He executed a bond for title agreeing to convey this forty-acre tract of land to his brother, G. W. Taylor, who entered into possession of the land. Under the contract G. W. Taylor was to pay $1,000 and 8 per cent. interest, payable annually. This thousand dollar indebtedness was also evidenced by a note dated January 9, 1932, payable August 20, 1932.

There was a provision in the bond for title, to which reference was made in the note, that 60 per cent. of the net proceeds from the peach crop grown on the lands should be applied annually to the indebtedness.

G. W. Taylor kept the place until November 21, 1933, when he made an assignment of his contract to C. C. James who assumed the obligations of the note and the bond for title. During the time that G. W. Taylor held the land he paid nothing on the debt. No peach crop was grown in 1932 and 1933.

G. W. Taylor listed the land with United Farm Agency and this agency advertised the lands with others for sale and sent the advertisements through the mail, one of the lists reaching the said C. C. James who then lived at Houston, Texas.

James wrote the Farm Agency and inquired if the farm was just as represented and received a reply to the effect that it was just as advertised. In addition, he was advised by the agency that after making the down payment he would not have to make any other payments except from the peach crops grown upon the land. James at once telegraphed $100 to bind the deal and upon arrival at Clarksville, and after having made an examination of the property, he paid the balance of the down payment, $200, to G. W. Taylor, or to the Farm Agency.

James took charge of the land and some personal property advertised and sold with it. He did some of the early spraying and cultivation required, pruning the trees, and in 1934 there was a prospect for a good crop of peaches from the orchard.

When James first reached Johnson county he went to see this property and stayed all night in a barn upon the land and then went out the next morning and made whatever inspection and investigation of the property he desired, looking it over to his satisfaction, or, at least he has not complained that proper opportunity to do so was not available. On that day he went with G. W. Taylor to the land agent's office, or to a law office, to close the deal, but did not do so on that day for the reason that the advertisement he had answered called for the payment of 80 per cent. of the proceeds of the peach crop instead of 60 per cent. as was provided for in the bond for title executed by Harve Taylor to G. W. Taylor. According to James, G. W. Taylor, or the land agent, one or the other if not both, desired to confer with Harve Taylor before changing the provision as stated in the advertisement to conform to the contract for the payment or delivery of 60 per cent. of the proceeds of the peach crop.

On the next day the same parties, that is to say, James, G. W. Taylor and the land agent met in an office where a written assignment of the bond for title executed by Harve Taylor to G. W. Taylor was prepared and duly executed. According to the terms of this assignment James agreed to assume, and did assume, the liabilities of G. W. Taylor to Harve Taylor evidenced by the note and bond for title.

The note provided for payment of the $1,000 with interest at 8 per cent. per annum. At the bottom of it there was: "Subject to extension as per terms of the bond for title given."

Although the bond for title provided the debt might be paid: "Sixty per cent. of the net proceeds of all fruit crops to be applied on the purchase price until fully paid, grantee to pay for the pruning, spraying, fertilizing and cultivation, and interest on the said note at the rate of 8 per cent. per annum from date until paid; interest payable annually," he now insists that he did not know at that time that interest payments upon the land were delinquent and he now insists that in several respects the property he bought, and that was delivered to him, did not come up to the statements of the advertisement and letter he received. In this regard he says there were 200 or 300 peach trees less than the number the advertisement stated; there was no spring or spring water upon the land; there was no barn as advertised; that the mule, which was part of the property he bought with the land, was then already dead. In fact, he now says there was a deficit in value amounting to $600.

James did not pay any interest upon this property though he says he spent about $100 in spraying the fruit trees, pruning them, cultivating and making ready for the 1934 crop.

Harve Taylor insisted some time in 1934 that the interest should be paid upon the note and finally gave James notice that he must pay. James was probably relying upon something that had been said to him by G. W. Taylor or the land agent when he wrote a letter to Harve Taylor in which he said, quoting: "I do not owe you or he one dam cent until I am here one year. Thanks for the notice. Awaiting your next move." This letter was dated the 9th of April. James in his letter was making some complaint as to the fact that he had nothing to work with and he also said in it: "I have been notified by your brother, G. W. Taylor, that you or he would make me leave between suns. I am sorry, but I want to gather the fruit before leaving."

Harve Taylor testified that he talked with James and that James had told him that he not only was not going to pay anything upon the obligations, but that he was going to gather the fruit and appropriate that to his own use without credit upon the note.

This suit was filed by Harve Taylor in which he alleged a breach and abandonment of the contract by James, his refusal to be bound by it and his threat to appropriate the fruit without making the proper application of it toward payment of the debt, and a receiver was prayed for and duly appointed to take charge of the fruit and farm. This suit was instituted just before the fruit had begun to ripen and the receiver took charge and had in his hands $419.13, proceeds of the crop after paying taxes, expenses and receiver's fee.

James sought a rescission and recovery of all sums spent by him on the farm, although he had disposed of a part of the personal property delivered to him. His proof seemed to establish the fact the mule had died before he had made the trade, and that he was not so advised either by the letter received before he wired the $100 down payment or by any of the parties thereafter, prior to date of closing the deal, and also claims that he was not so advised at the time the assignment was executed and delivered to him when he paid down the additional $200. He prayed for a rescission of the contract and the consequent return of the money paid down by him, and some damages. He prayed in the alternative that the debt be credited on interest, for damages for the deceit in the sum of $600. He made G. W. Taylor and the Farm Agency parties to his cross-complaint, although he was seeking to rescind and recover as against Harve Taylor also, who had contracted by this bond for title with G. W. Taylor.

There is some hint or suggestion, though not taken advantage of by the pleadings, that Harve Taylor was not the owner of the land and could not alone make a conveyance. In his complaint Taylor did not allege himself to be the owner of the entire tract of land, but said he had the right to convey and that he was the administrator of his father's estate, from whom he and his co-heirs

had received title. He proved without objection, and which may be treated as an amendment to his complaint, that he was ready and able to make conveyance of title in fee simple to this land. The plaintiff proceeded upon the theory that as maker of the bond for title he was in the position of one who had conveyed the property and had received or taken back a note and mortgage as security for the debt.

The court found all the facts, as we understand it, in favor of the plaintiff; that he was entitled to recover upon the note and bond for title, the indebtedness evidenced thereby; that $100 in the hands of the receiver, to restore the money sent by telegraph, should be delivered to James; the remainder of the money should be paid over to Harve Taylor; that James' cross-complaint should be in other respects denied; that the bond for title and assignment should be canceled and the title and possession of the property be delivered and restored to the plaintiff. James and the plaintiff both have appealed.

The court found James had defaulted in his payments. There might well have been a finding that there was not only the technical breach by default, but a disavowal of the obligation of the contract by him, and the consequent right of foreclosure by sale of the land. Plaintiff had a lien, not title, to the money in the hands of the receiver because it had been properly impounded. His lien could not be displaced to pay back money G. W. Taylor had allegedly obtained by his or his agent's fraud.

The defendant James made an inspection of this property before he made the down payment of $200; he had prior to that time in response to the advertisement and the letter received by him in regard to the property, sent $100 by telegraphing it either to the agent or to G. W. Taylor and immediately thereafter left his home in Houston, Texas, and went to Clarksville to complete the deal. His statement, as we have observed this record, to the effect that a mule he was purchasing in this contract was already dead at the time he arrived at the farm and that he did not know that fact, and was not advised of it until after he had signed the contract and paid over the additional $200, seems without substantial dis-

pute and under the record as it now appears he is entitled to relief to whatever extent proof may show the value of the mule to have been, but his remedy, in that respect, is not against Harve Taylor. We judge from some of the pleadings that there was perhaps a stated value either in the advertisement or in some of the conversations. If not, proof should be offered, if defendant James be so advised.

James attempts to protect himself against the effect of his inspection and examination of the property on the day before he executed the contract by saying that a lawyer advised him that he would have to pay the additional $200 of the down payment before he could recover the $100 already advanced, and which he still insists was procured from him through fraudulent inducements to enter into the contract. Whether this statement be true can make no difference for it would not change the law applicable to the situation.

After James made his inspection and examination of the farm to whatever extent he desired, he then went on and completed his contract making the entire down payment and thereby waived the alleged fraud he now insists upon. *Delaney* v. *Jackson*, 95 Ark. 131, 128 S. W. 859; *Darnell* v. *Bibb*, 143 Ark. 580, 221 S. W. 1061; *Carwell* v. *Dennis*, 101 Ark. 603, 143 S. W. 135; *Hildebrand* v. *Graves*, 169 Ark. 210, 275 S. W. 524; *Troyer* v. *Cameron*, 160 Ark. 421, 254 S. W. 688; *Nix* v. *Kirkland*, 173 Ark. 291, 292 S. W. 664.

He knew when he made the $200 payment, or at least he could have known from his examination, that there was a shortage in the number of fruit trees; he knew whether there was a spring upon the land and sufficient spring water or well water to supply his needs, or if there was a barn. If there had been deceit up to that time there certainly was none at the time he completed the transaction. He waived whatever deception or alleged misrepresentation there had been as to all these several matters.

James now insists that he was not to pay anything except from the proceeds of the peach crop. Those statements are in direct contradiction of the written contract

he adopted by the one signed, and, of course, may not be seriously considered. Not only did he say in his letters that he would not leave until he had gathered the peaches, but, according to Harve Taylor, he was going to gather the peaches and appropriate the proceeds without conforming to the contract he had made. He was denying indebtedness as to interest, although it was expressly set forth in the bond for title assigned to him and which he agreed to assume. Had this interest been mentioned only in the note held by Harve Taylor, James might have had an excuse, if not a real reason for his attitude. He was bound to take notice of what appeared in his line of conveyances.

So it appears the chancellor was correct in declaring that James had breached a contract. It follows Harve Taylor was entitled to a decree of foreclosure. Since he was entitled to a decree of foreclosure, the contradictory remedy of a rescission was not applicable to the rights of either one of the parties. It may be said if a rescission were proper, which it was not in this case, appellant James was correct in insisting that his entire amount of money should be returned to him and he should have been charged a reasonable amount for use and occupancy of the land during the time he was in possession. Under the law James was not the victim of any fraud practiced by plaintiff. Besides he had ratified the contract by accepting delivery of the property, and by selling and disposing of the personal property.

The proper remedy was to credit the amount of money in the receiver's hands on the debt, advertise and sell the land. James was a mortgagor in possession until the receiver took charge. As such, he was not entitled to credit for spraying, pruning, fertilizing or cultivating the land or making any improvements thereon. If he paid taxes on the land it was also a part of his legal obligations so to do. If Harve Taylor paid taxes on the lands after he sold to his brother, G. W. Taylor, he would have the right to recover such taxes as he may have paid.

It will appear from the foregoing, of course, that James was not entitled to have paid or delivered to him the $100 so ordered to be paid by the court from money

in the receiver's hands. If the land should sell for more than the debt and costs, James will receive the overplus. If there is a deficiency after the sale of the land, James will owe the balance.

The decree of the chancery court is, therefore, reversed and the cause remanded with directions to the chancery court to determine any matters not already settled by the record, particularly as between James and G. W. Taylor and his agents, and to proceed in accordance with this opinion to foreclose and sell the property, unless the indebtedness be paid by James, when the amount shall have been determined by decree.