BRYAN *v.* THOMAS.

5-1008                                    292 S. W. 2d 552

Opinion delivered June 25, 1956.

*Talley & Owen* and *William L. Blair,* for appellant.

*Thompson & Stripling* and *Wootton, Land & Matthews,* for appellee.

PAUL WARD, Associate Justice. A brief general statement of the facts preceding and leading up to this litigation will help to understand the issues involved on this appeal. Appellants, Vance Bryan and his wife Charlene, constructed the elaborate Jack Tar Hotel Courts in Hot Springs in 1947. In 1950 the properties were incorporated under the name of Jack Tar of Arkansas, Inc. with appellants owning practically all if not all of the stock. Some time thereafter appellants conveyed several parcels of real estate to the corporation. Substantially all of the money for the construction of the said hotel courts was financed initially by the Reconstruction Finance Corporation. Prior to the date of the incorporation appellants found themselves in financial difficulty and at different times borrowed large sums of money from Mr. C. D. Thomas, a resident of Texas. Most of appellants' negotiations with Thomas were conducted through Mr. Thomas' attorney, A. J. Thompson who lived at Nacogdoches, Texas. The first loan, in the amount of $100,000, which Thomas made appellants was secured by a bus station at Kilgore, Texas, a drug store

located near the hotel courts, and a piece of property on Lake Hamilton near Hot Springs. On November 23, 1951 (after the incorporation) the several loans made by Thomas to appellants were financed by a note in the total sum of $293,074.67, signed by appellants. This note was secured by the three properties above mentioned and also other properties.

In the fall of 1953 appellants became delinquent on the R. F. C. payments, and in order to avoid a foreclosure, tried to borrow an additional $22,500 from Thomas. Upon Thomas' refusal Mr. Bryan offered to transfer to Thomas one-half of the capital stock of the Jack Tar Corporation. This offer by Bryan was countered by an offer made by Attorney Thompson that Thomas would accept all of the stock in cancellation of the debt, and an agreement to this effect was prepared. Said agreement was mailed to Bryan on October 22, 1953 and on the following day Thomas and Thompson went to Hot Springs to meet with Bryan and to get the agreement signed.

The testimony regarding what happened at this meeting in the office of the hotel courts on October 24, 1953 has an important bearing upon the issues in this case.

Present at this meeting on October 24 was Thomas, Thompson, Bryan and Arnold Adams. Bryan states that he invited Arnold Adams, an attorney from Harrison, Arkansas, to be present because he knew that Adams had been representing the R. F. C. and he wanted him present for advice. It is admitted by all parties that one of the agreements reached was that the corporation would deed to Bryan all properties on which neither Thomas nor the R. F. C. had a lien. The particular properties involved in this litigation are (a) the drug store located adjacent to other hotel properties; (b) the manager's home which was directly adjacent to the hotel courts, and; (c) certain properties situated on Lake Hamilton, hereafter called the lake property. It is admitted by all parties that Thomas had a lien on the drug store property and the lake property but that neither

Thomas nor the R. F. C. had a lien on the manager's home. After whatever agreements were reached at this conference, Arnold. Adams was instructed to draw up deeds and papers carrying out said agreements, and pursuant thereto, he prepared a deed conveying the drug store to appellant Bryan and the lake property to appellant Charlene Bryan. These deeds were sent to Thompson for him to affix the corporate seal, which act he did and returned the deeds. It is the contention of appellants that said deeds were prepared in accordance with the agreement reached by the said parties. It is the contention of Thomas that the said two pieces of property were to be left in the corporation pursuant to the original agreement referred to above, since neither piece of property was clear of liens. Appellants contend that this part of the original agreement was changed during the discussion and that the deeds were prepared in accordance with the changed a g r e e m e n t. Thomas brought this suit to have said deeds cancelled.

A third disagreement between the parties arises out of the conference held on October 24, 1953. In that connection Thomas and Thompson give this version of what occurred: Bryan stated in effect that he had no ready cash, that he would therefore probably lose any property conveyed to him, but that he had approximately $15,500 in checks which the corporation owed him, and that he, Bryan, reached into a drawer and held up a large number of checks representing to them to be in the amount of said sum, and; That Thomas thereupon agreed to take care of said checks by reducing liens against other property belonging to Bryan to the extent of said amount. Bryan's version of what occurred is, in effect, that the corporation owed him to the extent of approximately $15,500 and that the checks were evidence of part of that amount only.

On April 14, 1955 appellees, C. D. Thomas and Jack Tar of Arkansas, Inc. filed a complaint, with numerous exhibits attached, setting forth in detail the agreements entered into in the office of the hotel court on October 24, 1953 and describing the circumstances under which the deeds above mentioned were executed. Said com-

plaint, insofar as it pertains to the issues raised on this appeal as above indicated, alleged: (a) A fraudulent scheme on the part of Bryan to induce Thomas to pay off certain debts and satisfy certain liens on certain described property belonging to Bryan and prayed for judgment in the amount of $7,361.83 against Bryan including the right of subrogation as to the liens discharged; (b) that Bryan falsely and fraudulently represented that he individually [and not the corporation] was the owner of the manager's home and thereby induced Thomas to agree to convey to Bryan the lake property in exchange thereof, and the prayer was for the cancellation of the deed by which the corporation conveyed the lake property to Bryan, and; (c) That there was no consideration passing to the corporation or to Thomas for the conveyance, by the corporation, of the drug store to Bryan, and that said purported conveyance was obtained through the fraudulent scheme of Bryan to enrich himself at the expense of Thomas and the corporation, and the prayer was for the cancellation of said deed.

(a) The trial court rendered judgment in favor of C. D. Thomas against appellants in the total sum of $7,361.83 and subrogated Thomas to the rights of the liens which he had satisfied in that amount theretofore existing on a part of Lots 4, 5, 6 and 14 of Block 157 of the United States Hot Springs Reservation (described by metes and bounds in the transcript) and on Lot 8, Block 156 and a part of Lot 9 Block 156 [described by metes and bounds in the transcript] of the United States Hot Springs Reservation. Appellants appeal from a portion of the judgment [$5,361.83] and from the order declaring a lien therefor on specific property. After a careful consideration of all of the testimony bearing on this issue we think the judgment of the trial court should be sustained on this item. Regardless of whether or not Bryan represented, on October 24, 1953, that he had checks against the corporation in the amount of $15,500, it does appear from the record, apparently undisputed by appellants, that the corporation was indebted to him in the amount of $7,513.31 as of date June 30, 1953 and

that this amount did not include checks which Bryan was holding against the corporation. It is admitted by appellant that he did cash checks on the corporation in the amount of $4,889.89. These two items together total only $12,403.20. On the other hand there is evidence from which the chancellor was justified in finding that Thomas paid out approximately $15,000 on behalf of Bryan in addition to the checks which Bryan cashed against the corporation in the amount above stated. Bryan's own testimony shows that he did not have possession of any checks against the corporation other than those which he cashed in the amount of $4,889.89, and he admits that the latter amount was paid to him by the corporation. The testimony justified the trial court also in finding that Thomas paid off liens on specific properties as above set forth and it was correct in subrogating Thomas to all the liens of the former lien holders against Bryan's property.

(b) Some of the testimony and facts relative to the controversy over the manager's home and the lake property are undisputed, and some are in dispute. It is admitted the title to both pieces of property was in the corporation at the time the agreements were reached on October 24, 1953; that neither Thomas nor the R. F. C. had a lien on the manager's home but Thomas did have a lien on the lake property; that there was an agreement that Thomas would trade the lake property for the manager's home, and; that a deed was executed by the corporation conveying the lake property to appellant, Charlene Bryan. There is a sharp disagreement as to other pertinent facts. Thomas contends that on the date above mentioned, Bryan represented that he held title to the manager's home in his own name, while Bryan denies making such statement and contends that Thomas knew or should have known from the records that the title was in the corporation. Thomas concedes that he did agree with Bryan that the corporation would convey back to Bryan all properties on which neither he nor the R. F. C. had a lien *or which were not necessary to the conduct of the business of the hotel courts,* while Bryan and Adams state that nothing was said about the property being

necessary to the business. If the testimony of Bryan and Adams is accepted then clearly the court was wrong in ordering a cancellation of the deed to Charlene Bryan. This is true because it would make no difference whether the title to the manager's home was in the corporation or in Bryan since Bryan was entitled to this piece of property under the agreement as they all understood it. A different situation would be presented however if appellees' testimony is accepted and if this was all the testimony, in which event it would be material to determine whether or not the manager's home was in fact necessary to conducting the business of the hotel courts.

There are however several facts and circumstances which throw light on the disputed question and we think they are sufficient to call for a reversal of the trial court's decree. On October 24, 1953, while Thomas and his attorney were in conference with Bryan and Arnold Adams, some kind of an agreement was reached and Adams was to prepare the deeds. Following these instructions Adams prepared a deed by which the corporation conveyed the lake property to Charlene Bryan. This deed was mailed to Mr. Thompson who is Mr. Thomas' attorney and who admits that he was looking after Mr. Thomas' business affairs as well as his legal affairs in connection with this deal. Mr. Thompson had every opportunity to examine the deed and he affixed the seal of the corporation and returned it to Bryan without comment or objection. A casual examination of the description would have revealed the nature of the property. It is a significant fact that Thomas never requested Bryan to deed the manager's home to the corporation. It would appear to us that if Thomas and Thompson were under the impression that the title to the manager's home was in Bryan that they would have been intensely interested in seeing that Bryan executed a deed to the corporation in exchange for the deed by the corporation to Charlene Bryan. It is also significant that Thomas in the written agreement executed on October 24, 1953, released his lien on the lake property. This fact, we think, stoutly confirms appellants' contention. This suit by Thomas to cancel the deed by which the

corporation conveyed the lake property to Charlene Bryan is based on fraud. In our opinion the evidence falls short of discharging the burden on Thomas to prove such allegation. In this kind of a case fraud is never presumed but must be shown by clear and convincing evidence. The rule is well stated in *Ellis* v. *Ellis,* 220 Ark. 639, 249 S. W. 2d 302, involving the cancellation of a deed where the court, after stating "fraud is never presumed" said: "The rule is well settled that before we would be warranted in setting aside, or altering this deed, the burden was upon appellant to show by a preponderance of the evidence that is clear and convincing that fraud had been practiced upon her in procuring its execution."

(c) A different situation is presented in regard to the court's action in cancelling the deed executed by the corporation conveying the drug store to Bryan, and we cannot say its finding is not supported by the testimony weighed under the rule above announced.

As in the case of the lake property, the deed in question was prepared by Arnold Adams according to the instructions which he is supposed to have received during the conference on October 24, 1953. The deed which Adams prepared and sent to Thompson for the corporate seal contained the descriptions of several parcels of land, some of which were by metes and bounds and rather lengthy. One parcel of land described in the deed was the drug store and it reads: "Lot 9 in Block 154 of Hot Springs Reservation, as surveyed, mapped and platted by the United States Hot Springs Commissioners." There was nothing, other than this description, to indicate it was the drug store property. It is admitted that Thomas had a lien on the drug store property. It is likewise undisputed that neither of the three written agreements provided for a conveyance of this property from the corporation to Bryan, or for releasing Thomas' lien thereon. This fact we consider most persuasive against appellants' contention herein. It would seem strange indeed that four intelligent people would draft three separate written agreements summarizing four or five hours of discussion, and overlook an

item of the importance and value of the drug store here involved. It is contended however by appellants that there was an oral agreement, aside from the written agreements, that the drug store property would be deeded to Bryan. Appellees positively deny that any such agreement was made.

It appears to us that the most significant and vital testimony revolves around the dispute as to whether or not Mr. Thompson, Thomas' attorney, made a partial draft of a deed which was supposed to have been given to Arnold Adams as a part of his instructions, and which partially prepared deed contained the legal description of the drug store with the words ''drug store'' written in bold letters at the beginning of the legal descriptions. A photostatic copy of this partially prepared deed was introduced in the record and is made an exhibit to appellees' brief. Mr. Thompson denies that he prepared this instrument but Mr. Adams is of the opinion that he did prepare it. If we were convinced that Mr. Thompson prepared the instrument, knowing it contained a description of the drug store, we would certainly be strongly persuaded that the chancellor's ruling was against the evidence. We do not question but that Mr. Adams is sincere in believing that Mr. Thompson did prepare the questioned instrument but a careful reading of the record convinces us that Mr. Adams must have been misled by someone.

It appears from the testimony that all parties were in a room and that there was only one typewriter in the room, and that the two supplemental agreements were written on that typewriter at that time, and, further, that the partial deed in question was written on the same typewriter. Adams states that he is not sure who handed the questioned instrument to him, but he is sure that he did not write the words ''drug store'' on the face of the instrument but that he did make other penciled notations on the margin which appear in the photostatic copy. A careful examination of the said photostatic copy and a comparison of it with the original two supplemental agreements makes it impossible for us to believe that they were all written on the same typewriter. The typ-

ing used on the agreements appears to have been written on a machine with pica type while the questioned instrument appears to have been written on a machine with elite type. This comparison also shows that 60 spaces on the machine writing the agreements extends approximately one-half inch farther than 60 spaces on the machine which wrote the questioned instrument. It further appears that there is a rather marked but distinct dis-similarity in certain letters and figures found in the agreements and the questioned instrument. There can be no doubt, for instance, that the typewriter which made the figures "5 and 6" on the questioned instrument was not the same typewriter which made the same figures on the other instruments.

The deed from the corporation to Bryan conveying the drug store property was, as above indicated, written by Mr. Adams in his office at Harrison and was mailed to Mr. Thompson on October 29, 1953. At the same time Mr. Adams wrote a letter to Mr. Thompson at Nacogdoches, Texas which he enclosed with the deed. In this letter he stated: "Enclosed are corporation warranty deeds conveying that part of Jack Tar of Arkansas, Inc. *which was not under mortgage* to either the R. F. C. or Mr. Thomas." (emphasis supplied) It is admitted, of course, that the drug store did not fall within this classification. While Mr. Adams explained that this was just a mistake on his part, yet the fact remains that this statement in the letter was misleading to Thompson and may account for his failure to examine more carefully the descriptions in the deeds, it being remembered that the words "drug store" were not a part of the description. Appellants call our attention to the fact that Bryan, as manager of the hotel courts, made regular monthly reports to Thompson of all proceeds derived from the business and that none of the reports showed any proceeds from the drug store. Mr. Thompson's explanation of this is that he was only interested in the gross receipts from the entire business and attached no significance to the source from which they were derived.

In view of what has above been set forth, and after a careful consideration of all of the testimony, we are unable to say that the trial court was in error in decreeing a cancellation of this deed.

We cannot agree with appellants' contention that the court erred in terminating their right of redemption. In paragraph 4 of the original agreement executed on October 24, 1953 Bryan was given "an option to refund or refinance the indebtedness of said corporation and . . . shall have 12 months from the date hereof in which to do so . . ." This was followed by certain conditions that Bryan would pay to Thomas all funds due him including interest, expenses and attorney fee. Paragraph 5 of the agreement provides in effect that this right of redemption was subject to the right of Thomas to sell the property for $1,200,000.00 and, after paying all debts and expenses, remit to Bryan the balance. We do not think the latter clause in any way extended the 12 month period in which Bryan had a right to redeem. The question here considered is further complicated however by a paragraph in the supplemental agreement in which Thomas stated: "I further agree that if sale is not made within the twelve months provided in the contract, but is sold by me at any time thereafter, that you will receive your then equity in the property in cash or its equivalent." Notwithstanding the above quoted provision, we have reached the conclusion, after a careful consideration of all of the provisions in the different agreements and letters, that appellants were entitled, at most, to a reasonable time in which to redeem. Certainly there must be some terminating point. As was stated in the case of *McCollum* v. *Niemeyer,* 142 Ark. 471, 219 S. W. 746, where a similar issue was under consideration: "We think it would be a strained construction to say the clause meant that appellant should have all time, or forever, in which to make the election." This suit was filed approximately one and one-half years after appellants were granted the right to redeem, yet it appears that they have not attempted to avail themselves of that right. Under these

circumstances we are unwilling to say that the court was not justified in terminating appellants' right to redeem.

It is ably insisted by appellants that the entire decree of the trial court should be reversed for the reason that this litigation was barred under the doctrine of *res judicata*. This contention is based on the fact that on April 30, 1954 the Jack Tar of Ark., Inc. brought an injunction suit against Bryan to prevent him from cutting off the thermal waters from the hot springs to the Jack Tar Bathhouse. We think however there are at least two reasons why appellants' contention in this matter cannot be sustained. In the first place C. D. Thomas and Charlene Bryan, who are parties to the instant litigation, were not parties to the injunction proceeding. Another reason is: In his answer to the injunction suit Bryan made certain allegations relative to the original agreement entered into on October 24, 1953, heretofore referred to, and on motion of Jack Tar of Ark., Inc. these allegations on the part of Bryan were stricken from the answer as not germane to the suit. This had the effect of confining the issues to the right of Bryan to cut off the flow of water, and for that reason the injunction suit could not be *res judicata* of the issues involved in this litigation.

It is therefore our conclusion that the decree of the trial court should be, and it is in all things hereby affirmed, except that it is reversed insofar as it decreed a cancellation of the deed conveying the lake property to Charlene Bryan. Since the trial court should make the proper orders to restore the lake property to Charlene Bryan this cause is remanded for that purpose only.