Harry A. DE BOER and Lucille DeBoer,
Plaintiffs,

v.

Robert DYKES and Mary Dykes,
Defendants.

Civ. A. No. 1493.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Oct. 30, 1959.

Shaw, Jones & Shaw, Ft. Smith, Ark.,
for plaintiffs.

Heilbron, Shaw & Beasley, Ft. Smith, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

On June 15, 1959, the plaintiffs, Harry A. DeBoer and Lucille DeBoer, husband and wife, filed their complaint against the defendants, Robert Dykes and Mary Dykes, husband and wife, to obtain a judgment for the amount due on a promissory note executed on July 1, 1954, by defendants to the order of plaintiffs and to foreclose a mortgage upon two tracts of land, referred to in the pleadings as tracts 1 and 2; and a chattel mortgage upon certain personal property located in a tourist court situated on tract 1.

Tract 1 was subject to a first mortgage held by Superior Federal Savings & Loan Association of Fort Smith, Arkansas, and a second mortgage held by E. A. Terry and wife, Laura Terry. The mortgage held by plaintiffs on tract 2 was a first, prior and paramount lien as to that tract, and likewise the chattel mortgage constituted a first, prior, and paramount lien on the personal property.

On July 8, 1959, the defendants filed their answer in which they admitted executing the promissory note and the two mortgages, but denied that the mortgages constituted a lien on any of the property described therein, and in paragraphs Nos. VIII and IX of the answer alleged:

"VIII.

"On or about May of 1954 the Plaintiffs offered for sale the Quail's Motel, an 11-unit auto court located on the real property designated as Tract 1 and real property adjacent thereto described as Tract 2 in the said Complaint. The Plaintiffs had owned and operated the Quail's Motel for a period of more than two years prior to May, 1954.

"Defendants state that they were induced to enter into the agreement for the purchase of Quail's Motel as a result of reasonably relying upon certain material misrepresentations of fact made by the Plaintiffs concerning Quail's Motel; that these false statements of fact were knowingly made by the Plaintiffs in a wanton, willful and malicious manner in order to induce the Defendants to purchase the said Quail's Motel. The aforesaid false statements of fact consisted of the following misrepresentations, to-wit:

"1. That the said Quail's Motel had produced a gross average monthly income of between $800.00 and $900.00;

"2. That the said Quail's Motel was paying its way;

"3. That the said Plaintiffs represented and stated to the Defendants that said Quail's Motel in its then condition, at the time of negotiations between them, was fully accredited and approved by the American Automobile Association.

"IX.

"If the said misrepresentations, alleged in Paragraph VIII hereof, had not been made by the Plaintiffs to the Defendants, the Defendants would not have purchased said Quail's Motel and real and personal property. The real value of the said Quail's Motel property in its true condition, at the time of the said sale, was not in excess of $30,000.00. It was sold by the Plaintiffs to the Defendants for $55,000.00, so that the Defendants were damaged in the amount of $25,000.00; therefore, the Plaintiffs are not entitled to recover from the Defendants herein, as prayed for in Plaintiffs' Complaint, because of said damages suffered by Defendants."

On July 13, 1959, the plaintiffs filed their reply to the answer of the defendants, in which they alleged:

"These plaintiffs deny that the defendants were induced to enter into an agreement for the purchase of Quail's Motel as the result of reasonably relying upon material misrepresentations of fact made by the plaintiffs; deny that the plain-

tiffs made any misrepresentations as alleged in Paragraph VIII of the Answer; deny that the defendants had any right to rely on such alleged misrepresentations.

"Plaintiffs deny each and all of the allegations contained in Paragraph IX of the Answer or that the defendants were damaged in any amount whatsoever."

On July 31, 1959, the plaintiffs filed an amendment to their reply, in which they alleged:

"Further replying, the plaintiffs state that notwithstanding the property described in the complaint and commonly referred to herein as 'Quail Motel' was worth the full sum of Fifty-five Thousand ($55,000.00) Dollars at the time of the sale to the defendants as alleged in the complaint, and notwithstanding the contract of sale therefor called for said sum, the defendants nevertheless acquired said property for a sum greatly less than the stated consideration.

"That the defendants represented to the plaintiffs that their property in Oklahoma City, Oklahoma, was valued at the sum of Thirty-five Thousand ($35,000.00) Dollars and that the defendants owned an equity above the mortgage indebtedness on said property of Twelve Thousand Seven Hundred Fifty ($12,750.00) Dollars. That said representation was false and fraudulent and made with the intent to have the plaintiffs rely upon the same and the plaintiffs had a right to and did rely upon said false representation and by reason of the same were induced to accept said property on the purchase price of the Quail Motel at a value of Twelve Thousand Seven Hundred Fifty ($12,750.00) Dollars. That in truth and in fact the equity of the defendants was the sum of Five Hundred ($500.00) Dollars, which was known to the defendants at the time they made said false representations and at the time of the con-

tract of sale. That the plaintiffs were enabled to realize only the sum of Five Hundred ($500.00) Dollars from said property and thereby sustained a loss and reduction in the price of the Quail Motel of Twelve Thousand Two Hundred Fifty ($12,250.00) Dollars."

The case was tried to the court without a jury on September 10 and 11, 1959. At the conclusion of the testimony the court requested the attorneys for the parties to submit written briefs in support of their contentions, and the case was submitted subject to the filing of the briefs. The able attorneys for the parties have furnished the court most excellent briefs in which they have thoroughly and earnestly argued their respective contentions. The court has considered the briefs along with the pleadings, the testimony, and the exhibits thereto, and now files this opinion in lieu of formal findings of fact and conclusions of law.

The plaintiffs and the defendants entered into a written contract (plaintiffs' Exhibit 5), which contract is dated June 15, 1954. However, there is a dispute as to the actual date of the execution of the same, but the time of its execution is not material. The contract provided that the plaintiffs agreed to sell to the defendants an 11-unit auto court, known as the Quail's Motel, located in Van Buren, Arkansas, together with all the furniture and equipment therein, and all signs advertising said business, including two large rental signs, and a three-acre tract of land located across the road from said motel, for a total consideration of $55,000.

The defendants agreed to convey to the plaintiffs certain real property situated in Oklahoma City, Oklahoma, in part payment of the purchase price, the value of which was stated in the contract to be $35,000, but which was encumbered by mortgages at the time in the amount of $22,250.

As provided by the terms of the contract, the defendants, upon the closing of the deal, paid the plaintiffs $5,000 and

assumed the payment of the existing mortgages on the tourist court. They executed the note sued on for the balance of the purchase and exchange price, and by its terms agreed to pay $200 per month on the note, with interest thereon at 6 percent. To secure the payment of said note, they executed the mortgages on all of the real estate and personal property which they were purchasing and obtaining from the plaintiffs.

On July 1, 1954, the purchase and exchange of properties were consummated. As required by the contract, the plaintiffs executed a deed conveying the tourist court and the personal property to the defendants. Likewise, the defendants executed and delivered to plaintiffs their deed conveying the Oklahoma City property to the plaintiffs. The purchase price of the motel was calculated as follows:

| | | |
|---|---|---|
| Assumption of balance of mortgage indebtedness evidenced by the two mortgages hereinbefore referred to | — | $19,289.31 |
| Exchange of Oklahoma property | — | 12,750.00 |
| Cash | — | 5,000.00 |
| Promissory note and mortgages executed by defendants to plaintiffs | — | 17,960.69 |

The monthly payments required to be paid on the mortgages held by the Superior Federal Savings & Loan Association and by E. A. Terry and Laura Terry, husband and wife, were $307.45, which included the payment on the principal, the interest and taxes.

The defendants made only one payment of $100 on September 1, 1954, on the note executed by them in favor of the plaintiffs, but did pay the monthly installments due on the two prior mortgages hereinbefore referred to, and it was stipulated at the trial that as of July 1, 1959, the amount due according to the terms of the note held by plaintiffs and sued upon herein was $23,218.89, with interest at 6 percent per annum from July 1, 1959; that the amount remaining unpaid on the mortgage held by Superior Federal Savings & Loan Association was $4,483.33 as of August 28, 1959; and the amount remaining due on the Terry mortgage was $1,824.22 as of August 28, 1959.

The defendants entered into possession of the motel on July 2, 1954, and, as above noted, only made one payment of $100 to the plaintiffs on the indebtedness sued upon, but did succeed in making the monthly payments on the prior mortgages so that between July 2, 1954, and August 28, 1959, defendants paid on the prior mortgages in principal, interest and taxes the sum of $19,061.90.

On their brief the defendants state that the plaintiffs told them:

"1.   That the Quail's Motel had produced a gross average monthly income of between $800.00 and $900.00;

"2.   That the said Quail's Motel was paying its way;

"3.   That the said Plaintiffs represented and stated to the Defendants that said Quail's Motel in its then condition, at the time of negotiations between them, was fully accredited and approved by the American Automobile Association.

"The Defendants say they reasonably relied on these false statements of the Plaintiffs and so relying they purchased the Quail's Motel for $55,000.00.

"The Defendants contend in their Answer that the true value of the Quail's Motel at the time of their purchase was 'not in excess of $30,-

'000.00'; that they were therefore damaged in the amount of $25,000.00 and that, therefore, the Plaintiffs are not entitled to recover from the Defendants."

The plaintiffs denied that they made any misrepresentations to the defendants to induce them to purchase the motel, and contend the property purchased by defendants was worth $57,839.93 on July 1, 1954.

On August 13, 1959, prior to the trial, and subsequent to the taking by defendants of discovery depositions of plaintiffs, and discovery depositions of defendants by plaintiffs, the defendants filed a motion to require the plaintiffs to produce and permit defendants to inspect and to copy their income tax returns for the years 1952, 1953 and 1954.

A hearing was had on the motion for the production of copies of the income tax returns, and at that time it was agreed that the attorneys for the plaintiffs would, if possible, obtain copies of the returns and that they would be made available to the attorneys for the defendants insofar as they reflected the total of the cabin rentals received by plaintiffs from the operation of the motel and so reported by them. At the trial the plaintiffs contended that they included in their representation of the gross income received by them from the motel the value of meals which they received as rental from the operator of the cafe situated in a building on the motel property. The attorneys for the defendants in open court again requested that they be permitted to examine the income tax returns to ascertain whether the reported income included any sums for the meals which the plaintiffs contended constituted part of the gross income from the motel while they were operating it. The attorneys for plaintiffs objected to permitting an examination of the returns, and the court stated that it would make no ruling on the question, but the plaintiffs were proceeding at their own risk by not furnishing the returns for the purpose of showing whether there was included in the gross income of plaintiffs any sums representing meals furnished them by the cafe while it was in operation on the motel property.

The plaintiffs on their brief, in discussing their failure to voluntarily produce the income tax returns said:

"Actually, insofar as substantive proof is concerned, it is not a question of whether or not the tax returns for the years 1952 and 1953 as filed by the plaintiffs included an item as income for meals taken from the cafe; that is an ancillary question, and the presence of or absence of such item in the tax returns could not constitute substantial proof; to the contrary, it would only either corroborate the plaintiffs by its presence or tend to impeach them as an admission against interest if it were absent. Its absence would not prove that the arrangement testified to by the plaintiffs for the rental of the cafe was not entered into nor would its presence in the income tax return be required in order that it be income from one of the facilities included in the motel property."

They further said:

"Whether or not the returns show the revenue from the rental of the cafe is only a collateral matter impeaching or corroborating the testimony of the witnesses."

Referring again to the hearing on the motion to produce the tax returns held prior to the trial, the attorneys for the plaintiffs did obtain a copy of the returns for the years 1952 and 1953, but apparently did not obtain a copy of the return for 1954 for the reason that the 1954 return was filed in Oklahoma City, and plaintiffs did not obtain the information as to where it was filed prior to the trial, but upon receiving the 1952 and 1953 returns, the attorneys for the plaintiffs disclosed to the attorneys for the defendants the one figure, that is, the total of the cabin rentals.

The court does not agree with the attorneys for the plaintiffs in their con-

tention that the income tax returns would not have been relevant in establishing the actual amount of the gross income from the motel if a part of the gross income was received in the form of meals furnished by the cafe operator as rental in payment of his rent. However, since the court did not enter an order and did not unequivocally act upon the motion and the subsequent request of defendants' attorneys that said returns be furnished for inspection, the court is disregarding entirely the question as to whether the plaintiffs in their representation to the defendants as to the gross receipts of the motel included therein any sum received by them in the form of meals for rental on the cafe. At the very most, the cafe was only operated eight months in 1952 and four months in 1953, and even if plaintiffs considered the meals received by them as rent, the amount is not substantial and the answer to the question of whether plaintiffs made material misrepresentations that induced the defendants to purchase the property does not depend upon the inclusion or failure to include the value of the meals in their representations of the gross income, nor is it essential to determine whether plaintiffs included in their representations of the gross income the small amount received by the plaintiff, Mrs. DeBoer, in the operation of a souvenir shop.

At the trial the defendants contended that the plaintiffs represented Quail's Motel had produced a gross average monthly income during the time of their operation of between $800 and $900; that the motel was paying its way, and that at the time of the negotiations that the motel was fully accredited and approved by the American Automobile Association.

The plaintiffs purchased the property on or about August 27, 1951, for a total consideration of $39,000. Of this amount the plaintiffs on that date paid $14,174.90 in cash and assumed the payment of the mortgages heretofore referred to on the property in favor of the Superior Federal Savings & Loan Association and E. A. Terry and Laura Terry.

They began operating the motel on September 1, 1951, and the average monthly gross income from cabin rentals for the remaining four months of 1951 was $569.10. In 1952 the average gross monthly income from cabin rentals was $771.04. The plaintiffs contend that during 1952 they received, as rental on a cafe, meals of the value of $1,440, and that they earned from the operation of the souvenir shop the sum of $307.09. If those two sums are added to the cabin rentals, then the average gross monthly income for 1952 from the entire business would be $916.63.

In 1953 the average gross monthly income from cabin rentals was $686.16, but plaintiffs contend that they received an additional sum of $720 as rental from the cafe in the form of meals, and that they earned $110 in the operation of the souvenir shop. If these two amounts are considered in determining the average gross monthly income, the total average gross monthly income for the year 1953 would be $755.32. In 1954 the average gross monthly income for the first six months, or until July 1, 1954, from cabin rentals was $502.54, and the court understands that there is no contention that any other income was received from the operation of the motel during that six-month period.

Both plaintiffs were engaged in the operation of the motel from the date of its acquisition until September 1953, at which time the plaintiff, Harry A. DeBoer, opened another business in Oklahoma City, Oklahoma, and left the operation of the motel to his wife, Mrs. Lucille DeBoer, from that time until July 1, 1954, when they sold the property to the defendants.

Both defendants testified unequivocally that the plaintiffs did represent that the average gross monthly income from the operation of the motel was between $800 and $900.

Mr. William J. Drake, the real estate agent, who represented the plaintiffs in the sale of the motel, and who lives at 4428 N.W. 22nd Street, Oklahoma City, testified by deposition that the plaintiff, Harry A. DeBoer, stated in a conversation with the defendants on their second trip to Van Buren to view the property in June 1954 that the gross income, which included the food sales, would run about $800 or $900 a month: "The question came up as to how much he was doing or how much it would do, and he said $800 or $900 a month."

He further stated that when he was employed by the plaintiffs to sell the property, he never discussed with Mr. DeBoer the gross income, but in the conversation with the defendants, the plaintiff, Mr. DeBoer, did state that the motel averaged between $800 and $900 gross per month.

The defendants did not ask the plaintiffs to furnish them any books of account, and when the plaintiffs vacated the property on July 1 or 2 they carried with them all of the room rental cards and other records, if any they had. It seems that they had what Mrs. DeBoer denominated a "master record book," where the monthly revenue and expenditures were itemized, but when she left the property she tore out all of the entries for the year 1954, notwithstanding she already had the individual card records of cabin rentals for that period. She stated she didn't need the sheets and she tore them from the record book; that she did not see any reason why she should leave such records in the book. The only inference that can be gained from such action on the part of Mrs. DeBoer is that she, for some reason, did not want any investigation made as to the average monthly revenue realized from the operation of the motel.

In 1955 when it became apparent to the defendants that they would be unable in the operation of the motel to pay the expenses of the operation, the monthly payments on the first and second mortgages, and $200 a month to the plaintiffs in accordance with the terms of the note sued upon, they wrote Mr. Drake and advised him that they were having difficulty in that the proceeds from the motel were not sufficient for them to meet their obligations. Mr. Drake wrote the defendants on March 17, 1955, and stated in effect that Mr. and Mrs. DeBoer had told him all along that the court would average "about $800 per month gross." On September 20, 1955, the defendants discussed their problem with Mr. Charles R. Garner, of the law firm of Hardin, Barton, Hardin & Garner, Fort Smith, Arkansas, and after discussing the problem, Mr. Garner wrote the plaintiffs a letter requesting them to contact him with reference to working out some settlement of the matter. In that letter Mr. Garner quoted the defendant, Robert Dykes, as saying: "He tells me that you represented all along that this court would average about $800.00 per month gross and further it was recognized by the Triple A. In reliance upon these and other representations Mr. and Mrs. Dykes purchased the court only to find that said court was not as represented."

The plaintiffs argue that the letters written by Mr. Drake and Mr. Garner, above referred to, are convincing that they never represented to the defendants that the average monthly gross income was between $800 and $900. However, the court is convinced that the plaintiffs did represent to the defendants that the average gross monthly income from the operation of the motel was between $800 and $900 per month.

At the time the defendants first visited the court on May 1, 1954, and later in June 1954, prior to closing the trade, a Triple A sign was on or near the court, and likewise there was one on the dual highway several hundred yards from the motel. The defendants testified that the plaintiffs represented that the motel was fully accredited by the Triple A. The plaintiffs deny they made any such mis-

representation, but the fact that the signs were there and the fact that the plaintiffs knew that the Triple A was demanding that certain improvements be made, and the fact that they did not reveal to the defendants all the facts concerning the status of the accreditation of the motel by the Triple A convinces the court that the plaintiffs did represent that the motel was fully accredited.

On December 1, 1953, the American Automobile Association by letter advised the plaintiffs that its Field Reporter had indicated in his report:

"* * * that there were some points about your establishment that were not quite up to the usual high standards of our operation. * * * He did point out, however, that the units could be more attractively furnished and decorated. He also mentioned that some of the units contained Army cots with very modest mattresses. In addition, he stated that some of the exteriors of the units could be made more inviting with a coat of paint. * * * This letter is written in a sincere desire to be helpful and we trust you will find it of value in your operation. It is our policy to give our affiliates these reports as they come in from the field so that they may have an opportunity to rectify any defects before the next Field Reporter calls.

"As you know, our first responsibility is to our members, and, therefore, should we receive a second substandard report on your establishment when we cover Arkansas again, we will be compelled to withhold our endorsement. We trust that this will not be necessary and that the next report we receive will be entirely favorable."

Apparently the plaintiffs did nothing to remedy the defects or to meet the requirements, and on June 29, 1954, just two or three days prior to the closing of the trade with the defendants, the Triple A wrote the plaintiffs again by registered mail and advised them that they would be unable to renew the AAA appointment. The letter further stated:

"We note that your establishment received a substandard rating last year and your official appointment was renewed on a probationary basis. At that time we wrote you a letter calling your attention to certain defects which needed correction before the next inspection of our Field Reporter. It would appear that insufficient improvements have been made since that date to bring your establishment up to standard."

The letter also requested the return of the official AAA emblem.

This letter was received by the plaintiffs on the day the defendants took possession, but even at that time the plaintiffs never advised the defendants of the status of the motel with the American Automobile Association.

The defendants had never had any experience in the operation of a motel, and they accepted at face value every representation made by the plaintiffs concerning the motel property, its accreditation by the AAA, and the amount of income that the property would produce. No records were produced, but the plaintiffs knew from their conversations with the defendants that the defendants would be compelled to look to the profits derived from the operation of the motel to meet the obligations assumed by them. Instead of taking action to foreclose their mortgage upon default in the monthly payments, which occurred on September 1, 1954, the plaintiffs chose to permit the defendants to continue to pay the monthly payments on the prior mortgages held by the Building & Loan Association and by Mr. and Mrs. Terry, and thus increase with each payment the value of the security represented by their mortgage on the motel property.

The court is convinced that the plaintiffs represented to the defendants that the gross average monthly income from

the operation of the motel was between $800 and $900; that the motel would pay its way and that it was fully accredited and approved by the American Automobile Association; that the defendants relied upon said representations and they were fraudulently made by the plaintiffs for the purpose of inducing the defendants to purchase the motel property.

This brings the court to a consideration of the actual market value of the property as it was on July 1, 1954, in order to determine the damages suffered by the defendants. At the time the plaintiffs purchased this property on or about August 27, 1951, it was situated on U. S. Highways 71 and 64, but these highways were subsequently relocated. On August 16, 1952, after it became known that the highways would be relocated, the plaintiffs purchased three acres of additional land extending from the motel cabins to the new dual highway, Nos. 71 and 64 then being under construction, which was opened for traffic in March of 1953, but not formally accepted by the Highway Department until later in the summer of 1953. Thus, at the time the defendants purchased the property, it was not situated on any highway, and the only access from the dual U. S. Highway was over a road constructed by the plaintiffs DeBoers leading from the highway across the three-acre tract of land to the motel cabins.

Mr. Robert Gelly, a lifetime resident of Van Buren and who was engaged in the real estate business in Van Buren and vicinity, testified that in his opinion, in June of 1954, the motel, exclusive of furnishings but including the land, tracts Nos. 1 and 2, had a market value of $23,500. On the other hand, Mr. Donald Roderick testified that in his opinion the property had a value of $55,000 in June of 1954. He also stated that in his opinion the motel had been hampered by not being approved by AAA.

From this testimony the court thinks that the maximum market value

of all the property purchased by the defendants would not exceed $40,000.

The plaintiffs, in their amendment to their reply to the answer of the defendants, alleged that the defendants misrepresented the value of their equity in the Oklahoma City property which was conveyed to them by the defendants as a payment on the purchase price of the motel; that the representation as to the value of the equity to be $12,750, made by defendants, was false and fraudulent and made with the intent to have the plaintiffs rely upon the same as they had a right to do, and because of the said false representation, the plaintiffs accepted said property on the purchase price of the motel at a value of $12,750; that in truth and in fact the equity of the defendants was the sum of $500, which was known by the defendants at the time they made the representations to plaintiffs of its value. The plaintiffs further alleged that they were subsequently able to realize only the sum of $500 from the property, and that they thereby sustained a loss and reduction in the price of the motel of $12,250.

The testimony offered by the plaintiffs in support of this claim failed entirely to establish that any misrepresentations were made by the defendants as to the value of their equity in the Oklahoma City property. On the other hand, the testimony shows that the plaintiffs with their agent inspected the property, and the proof did not establish any false representations on the part of the defendants, and therefore the claim of the plaintiffs that they should be allowed a reduction on the price received by them for the motel cannot be sustained.

The plaintiffs contend that the burden of proof devolves upon the defendants to prove by testimony the allegations contained in their affirmative answer, and that the proof of misrepresentations must be more than the proof necessary to support the simple burden of proof.

Of course, fraud is never presumed, and the rule is well settled that before a court is warranted in setting aside a transaction such as the one now before the court, the party alleging fraud must show by a preponderance of the evidence that is clear and convincing that fraud has been practiced in procuring the execution of the contract.

In Biddle v. Biddle, 206 Ark. 623, 177 S.W.2d 32, the court said at page 629 of 206 Ark., at page 35 of 177 S.W.2d:

"There is no rule more firmly established than the one that fraud will not be presumed, and the burden is on the party alleging it to prove it by a preponderance of the evidence which is clear and convincing."

See also, Bryan v. Thomas, 226 Ark. 646, 292 S.W.2d 552; Ellis v. Ellis, 220 Ark. 639, 249 S.W.2d 302.

The court is convinced that the defendants have discharged the burden of proof required of them, and have established without question that the purchase of the motel by them was induced by fraudulent misrepresentation of material facts.

The court has found that the reasonable market value of the motel property on July 1, 1954, was $40,000.

In Kotz v. Rush, 218 Ark. 692, 238 S.W.2d 634, the court at pages 695–696 of 218 Ark., at page 636 of 238 S.W.2d, said:

"The authorities generally seem to recognize the rule that false representations by the seller as to present or past income of the property sold or conveyed will, if relied upon by the purchaser, constitute actionable fraud. The following statement is found in 23 Am.Jur., Fraud and Deceit, § 68: 'A false representation by an owner of land, or his agent, seeking to dispose of the property commercially, as to the present or past income, profits, or produce thereof or as to the amount of rent received therefor is regarded as a statement of fact upon which fraud may be predicated if it is false, since these are matters within the representor's own knowledge. The same is true of an assertion that the profits of a business are or have been a certain sum annually, or a false statement as to what a business now earns.' See also, Williston on Contracts, § 1492, 55 Am.Jur., Vendor and Purchaser, § 84; Hecht v. Metzler, 14 Utah 408, 48 P. 37; Whitney v. Bissell; 75 Or. 28, 146 P. 141, L.R.A.1915D, 257; Cross v. Bouck, 175 Cal. 253, 165 P. 702; Hogan v. McCombs Bros., 190 Iowa 650, 180 N.W. 770; Vouros v. Pierce, 226 Mass. 175, 115 N.E. 297.

"The remedies of a purchaser in cases of this kind are set forth in Danielson v. Skidmore, 125 Ark. 572, 189 S.W. 57, 59, as follows: 'He may rescind the contract, and by returning or offering to return the property purchased within a reasonable time entitle himself to recover whatever he had paid upon the contract. Again he may elect to retain the property and sue for the damages he has sustained by reason of the false and fraudulent representations, and in this event the measure of his damages would be the difference between the real value of the property in true condition and the price at which he purchased it. Lastly, to avoid circuity of action and a multiplicity of suits, he may plead such damages in an action for the purchase money, and is entitled to have the same recouped from the price he agreed to pay. Matlock v. Reppy, 47 Ark. 148, 14 S.W. 546; Fort Smith Lumber Co. v. Baker, [123 Ark. 275], 185 S.W. 277.' "

In Miller v. Porter, 218 Ark. 841, 238 S.W.2d 940, the court quoted at length from Kotz v. Rush, supra, and on page 844 of 218 Ark., at page 941 of 238 S.W. 2d, said:

"Porter knew that Miller could not support himself and wife and also make the required contract payments unless the farm revenue was $400 per month; and Porter represented that it was that amount. With that material fact misrepresented by Porter and relied on by Miller, the case at bar is ruled by our holdings in Fausett & Co. v. Bullard, 217 Ark. 176, 229 S.W.2d 490, 491, and Kotz v. Rush, 218 Ark. 692, 238 S.W.2d 634 (opinion delivered March 19, 1951). In Fausett & Co. v. Bullard, supra, we said: 'There are many circumstances that justify the buyer in acting upon the seller's statements, even though there is an opportunity to discover their falsity. * * *' Citing Brown v. Le May, 101 Ark. 95, 141 S.W. 759, and Myers v. Martin, 168 Ark. 1028, 272 S.W. 856."

Thus, the court has reached a conclusion that the defendants are entitled to a credit as of July 1, 1954, of $15,000 on the note sued on as their damages, thus reducing the amount of the note due by defendants to plaintiffs to the sum of $2,960.69, with interest thereon at the rate of 6 percent per annum from July 1, 1954; that the plaintiffs are entitled to a judgment for said amount and are entitled to a foreclosure of the mortgages executed by defendants to secure the payment of said note.

The attorneys for plaintiffs may prepare precedent for a decree in accordance herewith establishing the lien of plaintiffs as alleged in the complaint, and directing that if the amount found due herein is not paid within 20 days, that the property shall be sold by a commissioner, to be appointed by the court, in the manner provided by law. Before presenting precedent for the decree to the court, the same shall be submitted to the attorneys for the defendants for their approval as to form, and in the event of disagreement as to the provisions of the decree, same may be presented to the court upon notice to defendants' attorneys.